# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

———————————

№ 10-CR-421 (JFB)

———————————

UNITED STATES OF AMERICA,

versus

JUVENILE MALE,

Defendant.

———————————

MEMORANDUM AND ORDER
December 14, 2010

———————————

JOSEPH F. BIANCO, District Judge:

On May 21, 2010, the government filed a Juvenile Information ("Information") against defendant Juvenile Male ("the defendant") charging him with one count of conspiracy to commit murder in aid of racketeering, 18 U.S.C. § 1959(a)(5); two counts of murder in aid of racketeering, 18 U.S.C. § 1959(a)(1); two counts of discharging a firearm during a crime of violence, 18 U.S.C. § 924(c)(1)(A)(iii); and two counts of causing the death of another through the use of a firearm, 18 U.S.C. § 924(j)(1). The government subsequently moved, pursuant to 18 U.S.C. § 5032, to transfer the case to district court in order to prosecute the defendant as an adult. On November 29, 2010, after written submissions had been filed with the Court, the Court conducted an evidentiary hearing on the government's transfer motion.[1] This Memorandum and Order contains the Court's findings pursuant to 18 U.S.C. § 5032.

For the reasons set forth herein, the Court finds that transfer of this case to district court for prosecution of the defendant as an adult is warranted in the interest of justice. More specifically, as discussed in great detail below, after conducting a hearing and carefully analyzing the statutory factors, the Court concludes in its discretion that the government has met its burden of proving by a preponderance of the evidence that the defendant's transfer to adult status is warranted. In fact, when the statutory factors are applied to the instant case, it is

———————————

[1] Section 5038(e) of the Juvenile Justice and Delinquency Prevention Act provides that neither the name nor the picture of any juvenile shall be made public during juvenile delinquency proceedings. The Court determined that, in order to comply with this provision and the other statutory provisions of § 5038 that require the confidentiality of juvenile records, the proceedings and all documents related to the Juvenile Information should be sealed.

hard to imagine a more compelling case for transfer to adult status. First, the nature of the alleged offense—namely, the defendant's alleged participation in the heinous, execution-style murder of a nineteen-year-old woman and her two-year-old son who had been lured to the woods of Central Islip—overwhelmingly favors, in the interest of justice, transferring the case to district court so that the defendant can be prosecuted as an adult. Moreover, this brutal and callous double-homicide of a woman and her child is alleged to have been committed as part of the defendant's participation in the racketeering activity of the violent MS-13 street gang. Thus, the Court finds that the nature of the alleged offense is entitled to special weight in this case. The juvenile justice system, including the limited sentencing options available in that system if the defendant is found guilty (such as the statutory maximum of five years' incarceration), is simply ill-equipped and woefully insufficient, under the circumstances of this case, to adequately address, in the interest of justice, these most grave charges when considered in conjunction with the other statutory factors. Second, with respect to the statutory factor regarding the age and social background of the defendant, he allegedly committed the offense when he was seventeen years, eight months old, and he is now eighteen years old. In addition, although he had a good relationship with his mother at home, his social background is alleged to have involved membership in the violent MS-13 street gang on Long Island and, at a minimum, was unstable outside the home. The Court concludes that this factor, when both age and social background are considered, weighs in favor of transfer. Third, the defendant's prior juvenile record, which includes a conviction that involved robbing and attacking a 7-11 store clerk, also strongly favors transfer. Fourth, with respect to the statutory factor regarding the defendant's present intellectual development and psychological maturity, the defendant's forensic psychological evaluation also supports transfer of the defendant to adult status. In particular, although the psychologist determined that the defendant may have some learning and emotional deficiencies, he concluded based upon his testing that the defendant was not mentally retarded and, in fact, noted certain indicia of intellectual development—including that the defendant has "rather impressive" reading skills and "exhibits signs of intellectual interest and has a surprisingly large vocabulary." (August 24, 2010 Report of Dr. Sanford L. Drob ("Dr. Drob Report") at 5, 8.) In addition, the psychologist noted a "quick temper" and an "odd and disturbing preoccupation with blood." (*Id*. at 4, 9.) Fifth, the factor regarding past treatment efforts also heavily supports transfer because the records from his prior treatment at OCFS-Brookwood in connection with the 7-11 juvenile conviction demonstrate that he has had an unsuccessful response to past treatment. Finally, although the final factor weighs against transfer given the apparent availability of out-of-state juvenile facilities that would have programs designed to treat the defendant's behavioral problems, this factor does not outweigh the other factors which overwhelmingly favor transfer. In short, after considering and weighing all of the statutory factors, as discussed in detail below, the Court has determined that the interest of justice would be served by treating the defendant as an adult in this case.

## I. THE CHARGES[2]

The charges against the defendant stem from his alleged involvement in La Mara Salvatrucha ("MS-13"), a criminal enterprise based in El Salvador and operating in Long Island, Queens, and throughout other parts of the United States and Central America. (Gov't Mem. of Law at 2-3.) On Long Island, MS-13 is alleged to have engaged in street wars with rival gangs that have resulted in the murder, shooting, and assault of MS-13 and rival gang members, as well as their families and innocent bystanders. (*Id.* at 2.) Twenty-two defendants allegedly associated with MS-13 have been charged with various crimes in a 42-count superseding indictment unsealed on July 30, 2010 in *United States v. Prado*, No. 10-cr-074 (JFB).

As set forth in the government's transfer motion, the defendant has been charged in connection with the murder of nineteen-year-old "V.A." and her two-year-old son, "D.T."[3] According to the allegations in the government's submissions, in early 2010, V.A., who had ties to the 18th Street Gang and the Latin Kings, both rival gangs of MS-13, became involved in a romantic relationship with an unnamed MS-13 member (referred to in the government's papers as "CC-1"). (Gov't Mem. of Law at 5.) After a dispute between V.A. and CC-1, V.A. gave CC-1's address to members of the 18th Street Gang, who thereafter went to CC-1's house on two occasions for the purpose of attacking him. (*Id.* at 5-6.) When CC-1 explained to the defendant and a second co-conspirator ("CC-2"), also a member of MS-13, that he had been threatened by members of the 18th Street Gang as a result of the information provided by V.A., CC-1, CC-2, and the defendant discussed, in sum and substance, that they had to retaliate against V.A. (*Id.* at 6.)

On February 4, 2010, CC-1 arranged to meet with V.A. and drove with CC-2 and the defendant to pick her up. (*Id.*) V.A. was accompanied by her two-year-old son, D.T. (*Id.*) After obtaining a handgun from another MS-13 member, CC-1, CC-2, and the defendant drove V.A. and D.T. to Central Islip, New York, where the defendant and his co-conspirators lured V.A. and her son into a wooded area. (*Id.*) Once they were in the woods, the defendant, CC-1, and CC-2 shot V.A. and D.T. (*Id.*) V.A. was shot once in the head and once in the chest, and her son was shot twice in the head. (*Id.* at 6-7.)

After the murders, in February 2010, the defendant, CC-1, and CC-2 fled from the United States to El Salvador. (*Id.* at 7.) On April 23, 2010, the government obtained an arrest warrant for the defendant and began preparing the paperwork necessary to have

---

[2] The allegations set forth herein were drawn from the information presented at the November 29, 2010 hearing and from the government's motion papers and supporting documentation. The Second Circuit has made clear that, on a transfer motion, a district court should not undertake an examination of the strength of the government's evidence, but instead should "assume that, for the purposes of the transfer hearing, the juvenile committed the offense charged in the Information." *United States v. Nelson*, 68 F.3d 583, 589 (2d Cir. 1995). Accordingly, the Court merely sets forth the allegations and the nature of the offense as they are alleged by the government and takes no position as to the relative strength of the evidence supporting those allegations.

[3] Although the government states that D.T. was two years old, the autopsy report states that D.T.'s given age was 14 months. (*See* Gov't Ex. 10.) This distinction is immaterial to the Court's legal analysis.

the defendant extradited from El Salvador. (*Id.*) Before that process was completed, however, on May 17, 2010, the defendant was arrested upon attempting to reenter the United States through Miami International Airport. (*Id.*)[4]

## II. LEGAL STANDARD FOR DISCRETIONARY TRANSFER

"A juvenile fifteen years of age or older who is 'alleged to have committed an act after his fifteenth birthday which if committed by an adult would be a felony that is a crime of violence' may be proceeded against as an adult where a district court, after a transfer motion by the Attorney General, finds that it is 'in the interest of justice' to grant a transfer." *United States v. Nelson*, 68 F.3d 583, 588 (2d Cir. 1995) ("*Nelson I*") (quoting 18 U.S.C. § 5032).[5] In evaluating whether a transfer to adult status would be "in the interest of justice," a district court must consider the following six factors and make findings on the record as to each: (1) the juvenile's age and social background; (2) the nature of the offense alleged; (3) the nature and extent of any prior delinquency record; (4) the juvenile's present psychological maturity and intellectual development; (5) the juvenile's response to past treatment efforts and the nature of those efforts; and (6) available programs that are designed to treat the juvenile's behavior problems. *See* 18 U.S.C. § 5032; *Nelson I*, 68 F.3d at 588. Given the presumption that exists in favor of juvenile adjudication, the burden is on the government to establish by a preponderance of the evidence that transfer is warranted. *See Nelson I*, 68 F.3d at 588; *United States v. John Doe #3*, 113 F. Supp. 2d 604, 605 (S.D.N.Y. 2000).

Although the Court must evaluate each of the six factors outlined in § 5032, it need not afford each of these factors equal weight, and instead "may balance the factors in any way that seems appropriate to it." *Nelson I*, 68 F.3d at 588. In particular, the Second Circuit has explained that "when a crime is particularly serious, the district court is justified in weighing this factor more heavily than the other statutory factors." *Id.* at 590. This is particularly true when the case involves "[t]he heinous nature of the crime of intentional murder," which "certainly may be a factor entitled to special

---

[4] The government also provided information based upon the defendant's inculpatory post-arrest statements. (*See* Gov't Mem. of Law at 7-9.) Although the defendant has not formally moved to suppress the statements, he does dispute their voluntariness. (*See* Def.'s Mem. of Law at 3-4.) However, the Court need not address the question of voluntariness because the Court does not intend to rely upon the defendant's statements in any way in connection with this motion. In other words, even without the defendant's statements, the Court finds, for the reasons set forth herein, that the government has clearly met its burden in demonstrating that transfer is appropriate in this case.

[5] In addition, § 5032 provides, in relevant part, that no juvenile shall be prosecuted "in any court of the United States unless the Attorney General, after investigation, certifies to the appropriate district court of the United States that . . . the offense charged is a crime of violence that is a felony . . . and that there is a substantial Federal interest in the case or the offense to warrant the exercise of Federal jurisdiction." 18 U.S.C. § 5032. The parties do not dispute that the government in this case has submitted an appropriate certification from the United States Attorney for the Eastern District of New York, certifying that the offenses charged in this case "are crimes of violence that are felonies" and that "there is a substantial federal interest in the case and the offenses to warrant the exercise of federal jurisdiction." (Gov't Mem. of Law, Ex. 3.)

weight." *Id.* Furthermore, the defendant's potential for rehabilitation typically should also be given "special emphasis." *United States v. Ramirez*, 297 F.3d 185, 193 (2d Cir. 2002). Indeed, the notion of rehabilitation "permeat[es] the transfer decision . . . [and] clearly is one of the primary purposes of the juvenile delinquency provisions." *United States v. Nelson*, 90 F.3d 636, 640 (2d Cir. 1996) ("*Nelson II*") (internal quotation marks and citation omitted). Nevertheless, even though a juvenile's potential for rehabilitation is a "crucial determinant in the transfer decision," this factor "must be balanced against the threat to society posed by juvenile crime." *Id.* (internal quotation marks and citations omitted). Accordingly, it is not sufficient for a court to find that there is merely a "glimmer of hope" for a juvenile's future treatment prospects. *Nelson I*, 68 F.3d at 590. Instead, a court must determine that the juvenile is "likely to respond to rehabilitative efforts," which is a standard that "strikes the appropriate balance [between] . . . . affording a defendant juvenile status when rehabilitation will work (and the rehabilitative goals of the juvenile system will be achieved), and allowing transfer to adult status when it will not (and the concerns of public protection and punishment become paramount)." *Nelson II*, 90 F.3d at 640 (citations and alterations omitted).[6]

III. ANALYSIS OF FACTORS

A. Juvenile's Age and Social Background

The Second Circuit has instructed that a district court should consider a juvenile defendant's age not only at the time of the offense, but also at the time of the transfer hearing. *See Nelson I*, 68 F.3d at 589 (finding that district court erred in refusing to consider juvenile's age at the time of the transfer hearing and noting that "unless the government intentionally delays the filing of juvenile charges, there is every reason to give weight also to the age at the time of the transfer motion. The statutory factor specifies only 'age,' and certainly, current age is significant for a determination of whether juvenile-type rehabilitation programs would be appropriate for the individual subject of the transfer application."). The closer the juvenile is to the age of majority, the more this factor weighs in favor of transfer. *See United States v. Juvenile Male*, 554 F.3d 456, 468-69 (4th Cir. 2009) ("A juvenile's age toward the higher end of the spectrum (eighteen), or the lower end (fifteen), is to be weighed either for or against transfer. Here, we agree that [the defendant's] chronological age (seventeen years and nine months) supports his transfer."); *Nelson I*, 68 F.3d at 589 ("[T]he more mature a juvenile becomes, the harder it becomes to reform the juvenile's

---

[6] Section 5032 of the Juvenile Justice and Delinquency Prevention Act also provides for the mandatory transfer of juveniles to adult status for purposes of prosecution where: (1) a juvenile, after his sixteenth birthday, allegedly commits an offense that would be a felony if committed by an adult; (2) the offense involved the use, attempted use, or threatened use of physical force, or, by its very nature, involved a substantial risk that physical force would be used in committing the offense; and (3) the juvenile "has previously been found guilty of an act which if committed by an adult would have been" one of the enumerated offenses supporting discretionary transfer. *See* 18 U.S.C. § 5032; *United States v. Juvenile Male #1*, 47 F.3d 68, 69 (2d Cir. 1995). In this case, however, the government does not contend that mandatory transfer is warranted. Accordingly, the Court need only analyze whether transfer is appropriate under the discretionary standard outlined *supra*.

5

values and behavior." (internal quotation marks and citation omitted)); *United States v. A.R.*, 203 F.3d 955, 961 (6th Cir. 2000) ("[T]he [district] court's noting A.R.'s advanced age was consistent with this Court's and other courts' conclusions that the closer a defendant is to eighteen, the greater the presumption that he be treated as an adult." (collecting cases)); *United States v. Doe*, 49 F.3d 859, 867 (2d Cir. 1995) (finding that district court did not abuse its discretion in concluding that age favored transfer where juvenile committed robbery at age 16½ and extortion at age 17, and explaining that "because Doe had continued to engage in acts involving [his gang] up to just a year short of his eighteenth birthday, the conduct with which he was charged did not occur either when he was very young or as an isolated indiscretion"); *United States v. H.V.T.*, No. 96-cr-244 (RSP) (GJD), 1997 WL 610767, at *3 (N.D.N.Y. Oct. 1, 1997) ("H.V.T. was almost 18 years old at the time of the conduct with which he is charged. Thus, the conduct did not occur when H.V.T. was very young, and age is a factor favoring transfer.").

In this case, the defendant, born on May 21, 1992 (Gov't Ex. 1), was 17 years, 8 months old at the time of the alleged murders and 18 years, 6 months old at the time of the hearing. The Court finds that the defendant's current age, which legally renders him an adult, and the fact that he was only four months shy of his eighteenth birthday at the time of the alleged murders, both weigh strongly in favor of transfer.

The Court also finds that the defendant's social background weighs in favor of transfer, albeit less so than his age. The defendant's family, despite being "exceedingly poor" and sometimes going without food, "presents a stable home" with a "loving and supportive" environment.

(Def.'s Mem. of Law at 2). The defendant reports being "treated well" by his mother (Dr. Drob Report at 1), and, consistent with this account, the defendant's mother has attended all of the defendant's court appearances, including his transfer hearing.[7] Furthermore, there is no evidence indicating that either the alleged prior gang activity or the heinous criminal behavior alleged in this case was condoned or accepted in the defendant's household. Nevertheless, the record demonstrates that the defendant's life outside of the home was considerably less stable. A probation report written in connection with the defendant's 2006 robbery conviction describes that the defendant had as many as 74 absences from school and had extensive disciplinary problems, including "lying to a staff member, endangering the safety of others, fighting with a student, causing a disturbance, . . . and postering for a fight." (Gov't Ex. 8 at 196.) In addition, while on probation for an attempted petit larceny offense, the defendant, *inter alia*, failed to

---

[7] There is conflicting evidence regarding the level of involvement that the defendant's father had in the defendant's life. On the one hand, the defendant self-reported to psychologist Dr. Sanford Drob that he had never met his father and, in fact, has no idea who his father is. (*See* Dr. Drob Report at 1.) On the other hand, the records submitted to the Court from OCFS-Brookwood, a juvenile detention facility where the defendant was housed for 3 years, reflect that the defendant's father left the home when the defendant was three or four and reentered the defendant's life for approximately six months when the defendant was ten or twelve. (*See, e.g.*, Gov't Ex. 8 at 1 & 196.) In any event, the Court need not resolve this conflict because, even assuming *arguendo* that the defendant has never met his father, this fact has no impact on the Court's decision and does not change the Court's conclusion that this factor weighs in favor of transfer.

attend community service and was involved in gang activity, thus leading a Suffolk County Family Court judge to conclude that the defendant "demonstrated that []he will not obey the authority of a parent or guardian" and that his parents were "unable to provide the degree of supervision necessary to safely care for the [defendant]." (*Id.* at 186-91.) Based upon this record, the Court finds that the defendant's age and social background, in conjunction, weigh in favor of transfer. *See Juvenile Male*, 554 F.3d at 468-69 ("In analyzing the first factor . . . . we agree that [the defendant's] chronological age (seventeen years and nine months) supports his transfer. With respect to [the defendant's] social background, the record is mixed. The district court found that [the defendant] had been raised in 'a loving and intact family,' and saw nothing in his 'social background that would suggest to [him] that gang activity was acceptable behavior.' In contrast to his family situation, however, [the defendant's] life outside the home was not stable. He joined MS-13 around the age of fourteen, and dropped out of school during the ninth grade when his grades and behavior deteriorated. [The defendant] began abusing alcohol at the age of fifteen or sixteen and started using cocaine and marijuana shortly thereafter. Such behavior indicates a lack of structure and support, and accordingly weighs against his transfer. In these circumstances, the district court did not clearly err in concluding that [the defendant's] social background 'minimally' favored his transfer to adult prosecution.").

B. Nature of the Offense Alleged

As an initial matter, as noted *supra*, a district court should not undertake an examination of the strength of the government's evidence in evaluating a transfer motion, but instead should "assume that, for the purposes of the transfer hearing, the juvenile committed the offense charged in the Information." *Nelson I*, 68 F.3d at 589; *see also United States v. Doe #1*, 74 F. Supp. 2d 310, 317 n.6 (S.D.N.Y. 1999) ("For the purpose of a transfer determination, the court must assume that the juvenile committed the offenses charged in the indictment."). There is no question that the offenses charged in the Information are serious and extraordinarily heinous crimes. The defendant and his co-conspirators are alleged to have lured their victims—a 19-year-old woman and her two-year-old son—into an isolated, wooded area and then to have killed them both execution-style. As the Second Circuit has noted, "[t]he heinous nature of the crime of intentional murder certainly may be a factor entitled to special weight." *Nelson I*, 68 F.3d at 590. Moreover, these murders were allegedly committed as part of the the defendant's participation in the violent racketeering activity of the MS-13 gang.

The Court finds not only that this factor weighs overwhelmingly in favor of transfer, but also that this factor should be afforded more weight than any of the other factors. *See id.* ("[W]hen a crime is particularly serious, the district court is justified in weighing this factor more heavily than the other statutory factors.") The Court has no doubt that the murder of a mother and her young son constitutes the type of "particularly serious" crime that warrants weighing the nature of the offense more heavily than any of the other factors in the transfer analysis. Indeed, many other courts have weighed this factor more heavily than the others where the crimes charged were as serious—or even, in some cases, less serious—than the crimes alleged here. *See United States v. One Juvenile Male*, 40 F.3d 841, 846 (6th Cir. 1994) (district court did not abuse discretion in concluding that

7

heinous nature of alleged offenses, which included several carjackings, during one of which an individual with the defendant shot and killed a car's passenger, "outweighed any factors that supported trying the defendant as a juvenile"); *United States v. A.R.*, 38 F.3d 699, 705 (3d Cir. 1994) ("The court made specific findings under each of the six statutory factors and explained how each weighed in the transfer decision. A.R. attacks this weighing, suggesting that the court overemphasized the 'seriousness of the offense' factor. Carjacking is a violent felony, however, and A.R. threatened his victims with a .25 caliber semi-automatic pistol. The court was entitled to give more weight to this factor than to others, and generally to weigh the statutory factors as it deemed appropriate."); *United States v. Hemmer*, 729 F.2d 10, 18 (1st Cir. 1984) ("In light of the gravity of the crime involved [armed bank robbery and conspiracy to rob a national bank], weighed against the other five section 5032 factors, we cannot say that the district court struck the balance improperly [in granting the government's transfer motion]."); *Doe #1*, 74 F. Supp. 2d at 321 (although majority of factors weighed against transfer, transfer nonetheless was warranted where the "defendant [was] charged with a host of serious crimes, including murder and other acts of violence," and the defendant also had a "demonstrated tendency to revert to criminal behavior"); *In re J. Anthony G.*, 690 F. Supp. 760, 766 (S.D. Ind. 1988) ("While all of the factors weigh very heavily, I feel that the seriousness of this offense is perhaps the most critical factor in this case. While his family seems very supportive of him, Anthony has chosen to break away from his family and lead a life that is completely unknown to them. Except for the fortuity of one of the four bullets striking the metal frame of the window, Anthony would have been accused not only of attempted robbery, but of murder.").

### C. Nature and Extent of Any Prior Delinquency Record[8]

---

[8] Although the Second Circuit has never addressed the issue, there is a circuit split regarding whether this factor should encompass both arrests and convictions, *see United States v. Wilson*, 149 F.3d 610, 613 (7th Cir. 1998), or whether it should apply only to convictions, *see United States v. Juvenile LWO*, 160 F.3d 1179, 1183 (8th Cir. 1998). The Tenth Circuit has acknowledged the split but has declined to reach the issue, finding instead that even if this factor were limited to prior convictions, a juvenile's additional conduct would be relevant to other factors in the transfer analysis. *See United States v. Anthony Y.*, 172 F.3d 1249, 1253-54 (10th Cir. 1999) ("Even if we limited Anthony Y.'s prior delinquency to the three adjudicated offenses, the additional conduct considered by the district court was relevant to several of the other statutory factors, like 'the age and social background of the juvenile,' 'the juvenile's present intellectual development and psychological maturity,' or 'the nature of past treatment efforts and the juvenile's response to such efforts.' [T]he plain language of those terms is broad enough to authorize the admission of evidence regarding almost any action, criminal or otherwise, the juvenile has taken, as long as it is relevant." (additional quotation marks and internal citations omitted)); *cf. A.R.*, 203 F.3d at 962 n.2 (citing *Anthony Y.* and noting "[w]e need not resolve this question since the district court did not place greater weight on this factor relative to others"); *Doe #1*, 74 F. Supp. 2d at 316 n.5 (noting split and stating that "the Second Circuit has given its implicit support to the notion that a juvenile's previous arrests may be relevant to the 'prior juvenile record' factor"). *But see In re Sealed Case*, 89 F.2d 363, 369 n.12 (D.C. Cir. 1990) (stating that a "juvenile's alleged violations of law" are "entirely unrelated" to other factors in the transfer analysis). In any event, this Court need

The defendant's criminal history dates back to the young age of 13, when the defendant was convicted for attempted petit larceny after he broke into a car parked at a Long Island Rail Road station and stole the car's stereo. (*See* Gov't Ex. 8 at 204-11, 215.) The defendant was sentenced to two years of "intensive" probation (*id.* at 208) and was ordered to complete 100 hours of community service and comply with a curfew. (*Id.* at 203.) However, the defendant violated his probation just over four months after being sentenced when he was involved in the robbery of a 7-11 store, during the course of which the defendant and another individual attacked the store clerk. (*Id.* at 196-200, 219.) The defendant, who was adjudicated as a youthful offender, pled guilty to a charge of robbery in the second degree and was sentenced to one to three years' imprisonment. (*Id.* at 224.) After serving approximately two years of his sentence, the defendant was released on parole in November 2008 at the age of 16.[9] However, the defendant violated his parole a mere six months later when, in March 2009, he was arrested and later convicted for graffiti and false personation. (*Id.* at 1; *see also* Gov't Ex. 6.) The defendant was then returned to OCFS-Brookwood, a juvenile detention facility, and ordered held until his maximum expiration date of October 21, 2009. (Gov't Ex. 8 at 1, 503.) The alleged murders charged in this case occurred less than four months after the defendant's release date from Brookwood.

As this record indicates, since the age of 13, the defendant has been in and out of juvenile detention facilities and has been unable to avoid illegal activity for more than six months at a time. The defendant has also engaged in increasingly serious crimes, moving from attempted petit larceny to robbery and is now alleged to have participated in a double-homicide as part of MS-13 gang activity. Given his prior record of recidivism, the Court finds that this factor weighs strongly in favor of transfer. *See United States v. Juvenile No. 1*, 118 F.3d 298, 309 (5th Cir. 1997) ("In addition to his numerous runaways, J.R.P. was charged in 1993 with theft of under $200 and in 1995 with theft of over $1500. On March 21, 1996, J.R.P. pled guilty to adult charges in state court of engaging in organized criminal activity. This evidence was sufficient to support the court's conclusion that this factor weighs in favor of transfer. The evidence indicates, as the court found, that J.R.P.'s delinquency record 'demonstrates a pattern of continuous lack of respect for authority. Although most of his prior offenses are non-violent runway [sic] charges, it indicates that his criminal activity is not an isolated event, but has continued despite prior corrective and rehabilitative effort in state court.'"); *Doe #1*, 74 F. Supp. 2d at 321 ("[T]he court is particularly concerned with the seriousness of the crimes alleged, and the recidivist behavior exhibited by defendant. . . . Of paramount concern to the court is John Doe's demonstrated tendency to revert to criminal behavior.").

---

not resolve this question because there is no dispute that the defendant has been convicted for each of the offenses relied upon by the Court in relation to this factor and the Court is not considering any conduct that related solely to an arrest.

[9] The record reflects that the defendant was housed first at Nassau County Secure Juvenile Detention Center from October 26, 2006 to December 29, 2006, and then at OCFS-Brookwood from December 29, 2006 until his release on November 19, 2008. (*See* Gov't Ex. 8 at 1, 3, 157.)

9

D. Juvenile's Present Psychological
Maturity and Intellectual Development

At the transfer hearing, the Court heard testimony from Dr. Sanford Drob ("Dr. Drob"), a clinical and forensic psychologist who prepared an evaluation of the defendant for the defense. Dr. Drob testified that he had one meeting with the defendant,[10] during the course of which he conducted a mental status exam and administered several psychological tests, including the Wechsler Abbreviated Scale of Intelligence exam ("WASI"), the Millon Adolescent Clinical Inventory test ("MACI"), and the Rorschach Inkblot Method ("RIM"). (Tr. at 12:11-13:3.) As to the defendant's intellectual development, his scaled IQ score of 66 on the WASI is in the deficient range of intellectual functioning. (*See* Dr. Drob Report at 5; Tr. at 18:11-19:1.) However, Dr. Drob made clear that he did not find the defendant to be mentally retarded. (Tr. at 18:23-19:1.) As Dr. Drob explained in his report, the defendant's overall low score was "compromised by a very deficient performance on the Block Design subtest," which is a nonverbal test of perceptual motor ability. (Dr. Drob Report at 5; *see also* Tr. at 19:15-20:1.) In contrast, the defendant's performance on a vocabulary test was much better, and, in fact, Dr. Drob found the defendant's reading skills to be "rather impressive." (Dr. Drob Report at 5.) Indeed, the defendant told Dr. Drob that "he has always enjoyed reading" (*id.* at 3) and that "he reads books and newspapers quite regularly." (Tr. at 14:25-15:1.) These statements are consistent with the defendant's high marks in some of the subjects he studied while at OCFS-Brookwood, including a 93 in New York State History, an 85 in English, and an 88 in American History. (*See* Dr. Drob Report at 5.)

Regarding the defendant's psychological maturity, the MACI test indicated "a number of areas of concern." (Tr. at 21:12-15.) In particular, Dr. Drob testified:

> [The test] suggested that [the defendant] again failed to develop a coherent sense of himself; that he has problems regulating his emotions and his impulses and his behavior; that he lacks competence to relate in more socially mature and appropriate ways; that in general he shows evidence of being socially, emotionally, and intellectually, or at least his view of the world is rather immature.

(*Id.* at 21:15-21.)

Dr. Drob also noted that the defendant had a "very high elevation" on a scale of borderline tendencies, which led Dr. Drob to conclude that the defendant's level of maturity was well below what would be expected for others his age in terms of his ability to, *inter alia*, regulate his emotions, have consistent rewards in personal relationships, and have a coherent sense of life, purpose, or goals. (*Id.* at 21:22-23, 22:24-23:3.) As explained by Dr. Drob, individuals with borderline personality tendencies are troubled—they have "difficulty in regulating a number of issues in their life," they have instabilities "in mood, affect, [and] impulse regulation," and they often have "very tumultuous

---

[10] Although Dr. Drob testified that he met with the defendant for approximately three hours (*see* Tr. at 12:13), the government introduced prison records indicating that Dr. Drob met with the defendant for only approximately an hour and 46 minutes. (*See* Gov't Ex. 16; Tr. at 78:15-17.) In any event, the Court need not address this conflict because the Court concludes that the difference in time is immaterial for purposes of the Court's decision.

10

interpersonal relationships." (*Id.* at 22:3-17.) Notably, Dr. Drob distinguished these characteristics from typical adolescent development. In particular, Dr. Drob explained that although instabilities in mood, affect, and impulse regulation exhibit themselves as part of normal adolescence, it is only when these instabilities are "very much exaggerated" in either late adolescence or early adulthood that they constitute borderline tendencies that could "interfere with the individual's mature adaptation to the world." (*Id.* at 22:13-17.) In other words, this type of immaturity is not merely a sign of adolescent behavior that an individual will grow out of with age, but instead represents an early marker for a mental illness that will stay with the individual and impair his ability to function in the world as an adult. In fact, Dr. Drob acknowledged that, given the fact that the defendant was 18 years old at the time of his evaluation, he could be categorized as having an adult personality disorder. (*Id.* 42:15-43:5.) Similarly, Dr. Drob acknowledged that the maturity deficits indicated by the RIM—such as an impaired ability to see the world as others see it and a tendency to misconstrue the boundaries of appropriate behavior and exercise poor judgment—could also be present in adults. (*Id.* at 24:4-25:9, 43:17-22.) Significantly, Dr. Drob was careful to avoid stating that the defendant lacked the maturity of an adult; instead, he qualified his testimony to state that the defendant lacked the maturity of a "well functioning" adult. (*Id.* at 26:1-6.) Moreover, Dr. Drob noted that the defendant was capable of logical and coherent thinking (*id.* at 25:10-11), and that the defendant's results on the RIM could have been the result, at least in part, of emotional impairments, as opposed to solely the result of cognitive deficits. (*Id.* at 24:14-20.) In addition, Dr. Drob stated in his report that the defendant had a "quick temper" and an "odd and disturbing preoccupation with blood." (Dr. Drob Report at 4, 9.)

Based on this record, the Court finds that this factor weighs in favor of transfer. On the one hand, the defendant's WASI score, while not enough to categorize the defendant as mentally retarded, was below average. Additionally, Dr. Drob found that the defendant's level of maturity was "quite limited" (*id.* at 26:1-3) and was "well below what would be expected of his age." (*Id.* at 22:24-25.) On the other hand, as to the defendant's intellectual development, Dr. Drob noted that the defendant's low WASI score was skewed by the defendant's particularly poor performance on one nonverbal portion of the test. Indeed, in seeming contrast to the defendant's low score, Dr. Drob reported that the defendant's reading skills were "rather impressive" and that he had "a surprisingly large vocabulary." (Dr. Drob Report at 5, 8.) Moreover, the defendant's performance on the RIM indicated that the defendant was capable of logical and coherent thinking, which is consistent with the high grades that the defendant received in certain classes that he took while at OCFS-Brookwood. Likewise, during the defendant's evaluation, Dr. Drob found the defendant's thinking to be "logical, goal directed and coherent" and his responses to be "appropriate to the context." (*Id.* at 4.) Moreover, Dr. Drob testified that the immature behaviors exhibited by the defendant could be found in adults and may, in fact, be symptoms not of adolescent immaturity but of an adult personality disorder. Thus, although there are elements of the defendant's maturity and intellectual development that weigh both for and against transfer, the Court finds that the defendant's logical and coherent thought patterns, his strong performance on verbal tests, his early symptoms of an adult

11

personality disorder—which would militate against rehabilitation—and the fact that his low IQ score may have been skewed because of his unusually poor performance on one particular subpart of the test combine to tip this factor in favor of transfer.[11] *See A.R.*, 203 F.3d at 962 ("[C]ourts have generally concluded that lower maturity and intelligence do not negate a transfer finding as long as a defendant has the cognitive ability to conform his conduct to the law."); *H.V.T.*, 1997 WL 610767, at *5 ("Both psychologists testified that H.V.T.'s intelligence was probably in the low average range, indicating no mental retardation. As to psychological maturity, both experts agreed that H.V.T. lacks emotional and psychological resources. Dr. O'Neill characterized H.V.T.'s behavior as distant. However, again no evidence was submitted indicating that H.V.T. has the psychological maturity of a child. Dr. O'Neill testified that there was no indication that H.V.T. was out of touch with reality but that H.V.T.'s traits were characterological, fixed, and persistent and that they were unlikely to change over time. I find that the intellectual development and psychological maturity factor favors transfer." (internal citations omitted)).

E. Juvenile's Response to Past Treatment Efforts and the Nature of Those Efforts

The defendant participated in both individual and group counseling during his incarceration at OCFS-Brookwood. (*See, e.g.*, Gov't Ex. 8 at 266.) The record indicates that, although the defendant was initially an active participant in group sessions and was "always willing to assist or participate," he subsequently became a more "limited participant" who took "a passive approach to group counseling." (*Id.* at 230, 239, 266.) As to the defendant's participation in individual counseling, the record reflects that the defendant was "open and honest," but he could also be defensive and was "convinced everyone [was] out to get him" and did not take responsibility for his behavior. (*Id.* at 230, 239, 266.)

Dr. Drob also testified that the defendant's ability to relate to Dr. Drob as a clinician and the defendant's own description of the therapy he received at Brookwood "suggested . . . that [the defendant] was capable of forming an appropriate attachment to a therapist and to receiving guidance from them." (Tr. at 26:14-20.) In reaching this conclusion, Dr. Drob pointed to the fact that the defendant "remembered specific things that were told to him by his therapist at Brookwood" and that the defendant "seemed quite engaged" in his discussion with Dr. Drob. (*Id.* at 26:21-24.)

Nevertheless, the Court finds that this factor weighs strongly in favor of transfer. First, it is clear from the defendant's criminal history that the treatment efforts made at OCFS-Brookwood had no impact on his recividist tendencies. To the

---

[11] Even assuming *arguendo* that this factor weighed against transfer, the Court would still conclude that transfer is warranted based upon a balancing of the other factors, for the other reasons set forth herein. *See, e.g.*, *Doe #3*, 113 F. Supp. 2d at 609 (granting transfer motion even where defendant's social background, his present intellectual development, and the availability of treatment programs weighed against transfer, and defendant's psychological maturity was a neutral factor); *Doe #1*, 74 F. Supp. 2d at 320-21 (transferring case even though defendant's social background, his present intellectual development and psychological maturity, his response to past treatment efforts, and the availability of treatment programs all weighed against transfer).

contrary, the defendant committed another offense in March 2009 after his release from Brookwood and is now alleged to have been involved in the double-homicide of V.A. and her son only four months after his final release from Brookwood.[12] *See Doe #1*, 74 F. Supp. 2d at 321 ("Of paramount concern to the court is John Doe's demonstrated tendency to revert to criminal behavior. . . . As rehabilitation is the primary purpose of the federal delinquency provisions, including § 5032, and the government has demonstrated by a preponderance of the evidence that rehabilitation is not likely in this case, the court finds that transfer of John Doe to adult status is warranted."). Second, with respect to Dr. Drob's conclusions, the mere fact that the defendant remembered certain things that his therapist had told him does not mean that he responded positively to treatment, or that he would be amenable to treatment in the future. In fact, the record indicates that although the defendant may have participated in counseling at Brookwood, during those sessions he was defensive, was convinced that people were "out to get him," and refused to take responsibility for his actions. (Gov't Ex. 8 at 230, 239, 266.) These behaviors strongly suggest not only that the defendant did not respond well to prior treatment efforts, but also that it is likely that any efforts to rehabilitate the defendant at this point would be futile. Accordingly, the Court concludes that this factor weighs heavily in favor of transfer.

F. Available Programs That Are Designed to Treat the Juvenile's Behavior Problems

The government asserted that, according to the Northeast Regional Office of the Bureau of Prisons, there are no federal facilities for individuals adjudicated as juvenile delinquents. (Gov't Mem. of Law at 29.) Instead, such individuals from this district would be sent to state contract facilities for juveniles in either Pennsylvania or Maine. (*Id.*) No such facilities would be available in New York State for individuals of the defendant's age. (*Id.*) The government also stated at the transfer hearing that the defendant would be ineligible for many juvenile treatment programs because he has already reached the age of 18. (Tr. at 79:22-24.)

The Court finds that the government has failed to meet its burden on this factor. As noted by the Second Circuit, the government must "do more than merely assert the unavailability of an appropriate program." *Nelson I*, 68 F.3d at 591. Instead, "[i]t must make a showing that it has investigated various options but is still unable to find a suitable and available program." *Id.* In this case, there is at least some indication that state juvenile facilities in either Pennsylvania or Maine might be able to house the defendant. Thus, the Court finds that this factor weighs against transfer, but does not outweigh the other factors which, in combination, overwhelmingly favor transfer. *See Doe #3*, 113 F. Supp. 2d at 609 (finding factor weighed against transfer where "the government did no more than merely assert the unavailability of an appropriate juvenile rehabilitative program for the defendant" and therefore "failed to

---

[12] The government also introduced evidence that, over the past several months while incarcerated at Nassau County Correctional Facility, the defendant allegedly has been involved in three fights with other inmates and allegedly possessed a shank in his cell. (*See* Gov't Ex. 7A-7D.) However, although the defendant has not disputed these allegations, the Court, in an abundance of caution, has not relied upon these allegations in any way in connection with its determination of the government's motion.

carry its burden of persuading the court that no such programs exist" (internal quotation marks, alterations, and citation omitted)).

\* \* \*

In sum, after carefully balancing all of the statutory factors based upon the record as set forth herein, the Court concludes that transfer of the defendant to adult status is warranted in this case in the interest of justice. As an initial matter, the defendant is charged with the heinous double homicide of a mother and her young son—the Court finds that this is precisely the type of serious and heinous crime that overwhelmingly weighs in favor of transfer. Moreover, a review of the factors demonstrates that the defendant is not likely to respond to rehabilitative efforts. For example, as described in detail *supra*, the defendant failed to respond to prior rehabilitative efforts. Indeed, as indicated by the defendant's criminal history, he repeatedly failed to take advantage of lenient sentences that he received and instead continued to reoffend. Furthermore, the fact that the defendant is already 18 years old, considered in conjunction with the other factors, also strongly suggests that he is not likely to respond to juvenile-type rehabilitation programs. *See Nelson I*, 68 F.3d at 589 ("[C]urrent age is significant for a determination of whether juvenile-type rehabilitation programs would be appropriate for the individual subject of the transfer application. Indeed, the more mature a juvenile becomes, the harder it becomes to reform the juvenile's values and behavior." (internal quotation marks and citations omitted)); *J. Anthony G.*, 690 F. Supp. at 766 ("The sorts of benefits that the federal Juvenile Justice Act was intended to provide are less achievable if the juvenile is within three months of reaching his 18th birthday when he committed the federal violation. With just a short period of time remaining before he concludes his minority, [the defendant] does not present a profile which I believe could be rehabilitated before reaching the age of 21."). Finally, the Court concludes that, when considered in their totality and in light of the entire record, Dr. Drob's findings indicate that the defendant would not be receptive to treatment efforts. In particular, Dr. Drob's report reveals that the defendant endorsed items on the MACI showing that the defendant "has difficulty with rules[] and enjoys starting fights." (Dr. Drob Report at 6.) Moreover, the defendant reported having a "quick temper" (*id.* at 4) and—even more troubling—a "fascination with blood" (*id.*) that Dr. Drob described as "odd and disturbing." (*Id.* at 9.) The Court finds these traits, in combination with the other factors, make it highly unlikely that the defendant would respond to any juvenile-type treatment efforts, and the defendant's rehabilitation potential therefore is low.

The Second Circuit has made clear that "while rehabilitation is a priority, the courts are not required to apply the juvenile justice system to a juvenile's diagnosed intellectual or behavioral problems when it would likely prove to be anything more than a futile gesture." *Nelson I*, 68 F.3d at 590 (internal quotation marks and citation omitted). In addition, "the goal of rehabilitation must be balanced against the threat to society posed by juvenile crime." *Nelson II*, 90 F.3d at 640 (internal quotation marks and citation omitted). Accordingly, given that the crimes charged here involve the "heinous . . . crime of intentional murder," *Nelson I*, 68 F.3d at 590, and given that the record demonstrates that the defendant is unlikely to be rehabilitated, the Court concludes that the government has overwhelmingly met its burden of showing that transfer is warranted in this case. Thus, the government's motion

to transfer the defendant to adult status is granted.

## IV. CONCLUSION

For the reasons set forth above, after thoroughly considering and balancing the statutory factors set forth in 18 U.S.C. § 5032, the Court finds that transfer of the defendant to adult status is in the interest of justice. Accordingly, the government's motion to transfer the defendant to district court for prosecution as an adult is granted.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: December 14, 2010
      Central Islip, New York

\* \* \*

The United States is represented by Loretta E. Lynch, U.S. Attorney, Eastern District of New York, 610 Federal Plaza, Central Islip, New York 11722 by John J. Durham, Assistant U.S. Attorney. Defendant Juvenile Male is represented by Anthony S. Senft, Jr., Esq., 21 Carleton Avenue, East Islip, New York 11730.